# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

SEP - 7 2006

J T NOBLIN CLERK
BY_____DEPUTY

**FAYE JACKSON**                                                          **PLAINTIFF**

v.                                        CIVIL ACTION NO. 3:06cv494 HTW-LRA

**SPRINT COMMUNICATIONS**
**D/B/A SPRINT PCS, ECHOSTAR**
**COMMUNICATIONS CORPORATION**
**D/B/A DISH NETWORK, AND**
**AFNI, INC.**                                                          **DEFENDANTS**

## ORIGINAL COMPLAINT FOR DAMAGES
## AND DEMAND FOR TRIAL BY JURY

### I.
### INTRODUCTION

1.     Comes now the Plaintiff, Faye Jackson, by and through counsel, and files

this Complaint against the Defendant for violation of the Fair Credit Reporting Act

(FCRA), 15 U.S.C. 1681 *et seq.*, and in support thereof would show the following, *to-wit*:

### II.
### JURISDICTION

2.     Plaintiff respectfully asserts that jurisdiction is proper in this case based

upon 28 U.S.C. 1331, in that this dispute involves predominant issues of federal law.

Further, that the parties to these proceedings are citizens of different states. 28 U.S.C.

1332.   Plaintiff also asserts actions under states' laws which may be brought within the

supplemental jurisdiction of this Court and Plaintiff respectfully requests that this

Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. 1367.

Venue in this District is proper in that the Defendants conduct business here and as such

the conduct complained of occurred here.

### III.
### PARTIES

3.    That Plaintiff, Faye Jackson, is adult resident citizen of Hinds County,

Mississippi.

4.    That Sprint Communications d/b/a Sprint PCS, is a foreign corporation

which may be served with process of this Court by serving it registered agent for service

of process, Prentice-Hall Corporation, located at 506 South President Street, Jackson,

Mississippi 39201.

5.    That Echostar Communications Corporation d/b/a Dish Network, is a

foreign corporation which may be served with process of this Court by serving its

chairman and chief executive officer, Charles Ergen, located at 9601 South Meridian

Boulevard, Englewood, Colorado 80112.

6.    That Defendant, Afni, Inc., is an Illinois corporation which may be served

with process of this Court by serving its registered or statutory agent, CT Corporation

System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

### IV.
### TRIAL BY JURY

7.    That Plaintiff, Faye Jackson, is entitled to and hereby requests a trial by

jury. U.S. Const. Amend. 7, Fed. R. Civ. Pro. 38.

**V.**
## REQUEST FOR EXEMPLARY/PUNITIVE DAMAGES

8.      That Plaintiff, Faye Jackson, respectfully requests that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, exemplary or punitive damages may be awarded against the Defendant under federal and state laws.

**VI.**
## REQUEST FOR COSTS OF LITIGATION AND ATTORNEYS' FEES

9.      That Plaintiff, Faye Jackson, respectfully requests that this Honorable Court instruct the jury, as the trier of facts, that in addition to an award of damages, and the costs of litigation, Plaintiff also seeks an award of reasonable attorneys' fees incurred.

**VII.**
**A.**
## FACTUAL ALLEGATIONS
## SPRINT PCS & AFNI, INC.

10.      That Plaintiff discovered that the Defendants Sprint PCS and Afni, Inc. had caused to be furnished false and derogatory information to the national consumer reporting agency, Equifax Information Services, Inc. ("Equifax"), regarding a ($418) collection account for the Defendant Sprint PCS.

11.      That Plaintiff requested an investigation of the collection account through Equifax for which Equifax published the results of their investigation dated April 24, 2006 (*See* Exhibit "P-1").

12.      That Equifax received verification of the false and derogatory collection account despite the Plaintiff not owing the Defendant Sprint PCS or the Defendant Afni,

3

Inc. for ($418) or any other amount whatsoever.

## B.
## FACTUAL ALLEGATIONS
## DISH NETWORK & AFNI, INC.

13.     That Plaintiff also discovered that the Defendants Dish Network and Afni, Inc. had caused to be furnished false and derogatory information to Equifax regarding a ($405) collection account for the Defendant Dish Network.

14.     That Plaintiff requested an investigation of the collection account through Equifax for which Equifax published the results of their investigation dated August 14, 2006 (*See* Exhibit "P-2").

15.     That Equifax received verification of the false and derogatory collection account despite the Plaintiff not owing the Defendant Dish Network or the Defendant Afni, Inc. for ($405) or any other amount whatsoever.

## VIII.
## CLAIM FOR RELIEF

16.     Plaintiff repeats, re-alleges and incorporates by reference to the foregoing paragraphs.

17.     That Defendant Afni, Inc. is a third-party debt collector as defined by the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. 1692 *et seq.*, and acts as the agent for those from whom debts are referred to them for third-party collection action.

18.     In this action, Defendant Afni, Inc. furnishes consumer credit information to one or more consumer reporting agencies.

4

19.     In this action, the Defendants Sprint PCS and Dish Network are liable to the Plaintiff for negligently selecting the Defendant Afni, Inc. for their third-party debt collector pursuant to the order entered by this Court in the case of *Freeman, et al. v. CAC Financial, et al.*, 3:04cv981WS.

20.     The Defendants' actions evidence a breach of their responsibilities under the FCRA.

21.     That Plaintiff has suffered damages due to the actions, inactions and conduct of the Defendants.

22.     That the Defendants have duties to each consumer as provided in the FCRA and other states' laws.

23.     That the types of injuries and harms incurred by Plaintiff were foreseeable.

24.     In addition, the Defendant is liable unto Plaintiff in a sum to be assessed by the trier of fact for punitive/exemplary damages under common law, states' laws and/or for willful violation(s) of the provisions of the FCRA.

25.     That the Defendants have negligently, recklessly, willfully and/or intentionally violated the FCRA and caused damage to Plaintiff.

26.     That the Defendants failed to fulfill their responsibilities under the FCRA to notify the consumer reporting agency(ies) to which they reported of the inaccurate information furnished by them for insertion in to the Plaintiff's consumer credit files.

27.     That the Defendants have continued to cause the dissemination of false information regarding Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Faye Jackson, prays that upon a hearing of this matter, this Honorable Court will enter a judgment against the

Defendant for all reasonable damages sustained by her including, but not limited to, compensatory damages, out-of-pocket expenses, costs and time of repairing her credit, loss of privacy, pain and suffering, embarrassment, inconvenience, lost economic opportunities, loss of incidental time, frustration, emotional distress, mental anguish, and for punitive damages, attorneys' fees, and court costs, and all other assessments proper by law and any an all other applicable federal and states laws, together with interest thereon from the date of judicial demand until paid, and, further, that this Honorable Court order the Defendant to once-and-for-all resolve Plaintiff's dispute in her favor. Plaintiff prays for other such relief, specific or general, as may be deemed proper by this Court in this matter.

Respectfully submitted,

FAYE JACKSON, Plaintiff

OF COUNSEL:

JOSEPH PATRICK FRASCOGNA, MS Bar #8897
FRASCOGNA COURTNEY, PLLC
4400 Old Canton Road, Suite 220
Jackson, Mississippi 39211
*t* 601.987.3000
*f* 601.987.3001
*e* pfrascogna@frascourtlaw.com

STATE OF MISSISSIPPI

COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, on this the $30$ day of August 2006 within my jurisdiction, the within named, FAYE JACKSON, who acknowledged that she executed the above and foregoing instrument and stated on her oath that the matters and things set forth in the above and foregoing Complaint are true and correct as therein stated.

_____
NOTARY PUBLIC


My Commission Expires:

..... PUBLIC STATE OF MISSISSIPPI AT LARGE
MY COMMISSION EXPIRES: June 16, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

P.O. Box 105518
Atlanta, GA 30348

April 24, 2006

## EQUIFAX

 **To Start An Investigation, Please Visit Us At:**
www.investigate.equifax.com

000543548-13
Faye Jackson
1112 Arbor Vista Blvd
Jackson, MS 39209-7136

Dear Faye Jackson:

Below are the results of your request for Equifax to reinvestigate certain elements of your Equifax credit file. Equifax contacted each source directly and our investigation is now completed. If you have any additional questions or concerns, please contact the source of that information directly.

**Results Of Your Investigation**

>>> **We have reviewed the former address. The results are:** This item has been deleted from the credit file. *1112 Arbor Vista Blvd Melbourne FL 32982*

>>> **We have researched the collection account. Account # – 178036 The results are:** This item has been deleted from the credit file.

>>> **We have researched the collection account. Account # – 574581254 The results are:** This item has been deleted from the credit file.

>>> **We have researched the credit account. Account # – SPRINT PC-209373° The results are:** Equifax has verified that this item has been reported correctly. If you have documents that release you from this obligation, please forward a copy to us. Additional information has been provided from the original source regarding this item.

>>> **We have researched the credit account. Account # – 209059° The results are:** This item has been updated to report as paid in full.

>>> **We have researched the credit account. Account # – 190059° The results are:** This item has been deleted from the credit file.

>>> **We have reviewed your concerns and our conclusions are:**

Currently Equifax is not reporting an account for helig MYERS or palisades on the credit file.

If you have any additional questions regarding the information provided to Equifax by the source of any information, please contact the source of that information directly. You may contact Equifax regarding the specific information contained in this letter within the next 60 days by visiting us at www.investigate.equifax.com.

Thank you for giving Equifax the opportunity to serve you.

**EXHIBIT**

P-1

P.O. Box 105518
Atlanta, GA 30348

August 14, 2006

## EQUIFAX

 To Start An Investigation, Please Visit Us At:
www.investigate.equifax.com

I..I.II.I....II.II.I.I..I.I.I..II..I...II..I.II.I

000557541-1
Faye Jackson
1112 Arbor Vista Blvd
Jackson, MS 39209-7136

Dear Faye Jackson:

Below are the results of your request for Equifax to reinvestigate certain elements of your Equifax credit file. Equifax contacted each source directly and our investigation is now completed. If you have any additional questions or concerns, please contact the source of that information directly.

>>> *We have researched the credit account. Account # - SPRINT PC-200373* *The results are:* This creditor has verified to Equifax that the balance is being reported correctly. Additional information has been provided from the original source regarding this item. If you have additional questions about this item please contact: *Anderson Fin Network/Bloom, 404 Brock Dr, PO Box 3097, Bloomington, IL 61702-3097*

If you have any additional questions regarding the information provided to Equifax by the source of any information, please contact the source of that information directly. You may contact Equifax regarding the specific information contained in this letter within the next 60 days by visiting us at www.investigate.equifax.com.

Thank you for giving Equifax the opportunity to serve you.

### Notice to Consumers

Upon receipt of your dispute, we first review and consider the relevant information you have submitted regarding the nature of your dispute. If the review does not resolve your dispute and further investigation is required, notification of your dispute, including the relevant information you submitted, is provided to the source that furnished the disputed information. The source reviews the information provided, conducts an investigation with respect to the disputed information and reports the results back to us. The credit reporting agency then makes deletions or changes to your credit file as appropriate based on the results of the reinvestigation. The name, address and, if reasonably available, the telephone number of the furnisher(s) of the information contacted while processing your dispute(s) is shown under the "Results of Your Investigation" section on the cover letter that accompanies the copy of your revised credit file.

If you still disagree with an item after it has been verified, you may send to us a brief statement, not to exceed one hundred words (two hundred words for Maine residents), explaining the nature of your dispute. Your statement will become part of your credit file and will be disclosed each time that your credit file is accessed.

If the reinvestigation results in a change to or deletion of the information you are concerned about, or you submit a statement in accordance with the preceding paragraph, you have the right to request that we send your revised credit file to any company that received your credit file in the past six months (twelve months for California, Colorado, Maryland, New Jersey and New York residents) for any purpose or in the past two years for employment purposes.

EXHIBIT

P-2

Exhibit 2



**Federal Trade Commission**
**Protecting America's Consumers**

## UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
## WASHINGTON, D.C. 20580

Division of Credit Practices
Bureau of Consumer Protection
Clarke W. Brinckerhoff
Attorney
(202) 326-3224

March 3, 1998

Paul H. Schieber, Esq.
Blank Rome Comisky & McCauley
One Logan Square
Philadelphia, PA 19103

Dear Mr. Schieber:

This responds to your letters dated November 28, 1997, and January 22, 1998, on behalf of the Mortgage Insurance Companies of America ("MICA"), stating your opinion that Section 615(a) of the Fair Credit Reporting Act ("FCRA") does not require a mortgage insurer to provide notice to an applicant for a residential mortgage when it refuses to insure the loan for which the consumer has applied.

You describe a common scenario in the mortgage lending industry in which a lender submits a residential loan application file to a mortgage insurer ("MI") to obtain insurance that protects the lender against the consumer's default on that loan. A credit report from a major credit bureau, which the MI may receive as part of the file or obtain on its own, is often a part of the MI's decisionmaking process. It is not uncommon for the first MI contacted by the lender to decline coverage, but for another MI subsequently to insure the transaction, with the result that the consumer obtains the loan.

Section 615(a) provides that a person that "takes adverse action with respect to any consumer that is based in whole or part on any information contained in a consumer report" must notify the consumer of the action, and provide information relating to the consumer reporting agency that provided the report and the consumer's rights under the FCRA. You support your belief that an MI should not be required to provide this notice with (1) a legal argument that the section does not apply where an MI declines to insure a consumer residential loan based on the credit report on the applicant, and (2) a policy argument that consumers will be confused or distressed by the notices. We disagree, for the reasons set forth in this letter.

In our view, the plain language of Section 615(a) requires MIs to provide the notice. First, an MI takes "adverse action" -- in both the common sense and legal definition of that term -- when it declines to extend insurance coverage that is a prerequisite for approval of the consumer's residential mortgage loan application. That term is defined broadly by Section 603(k)(1)(B)(i) to include "a denial ... in connection with the underwriting of insurance . . . ." An MI's refusal to insure a consumer loan is certainly a "denial in connection with the underwriting of insurance."

Similarly, the term "consumer report" is defined broadly in Section 603(d) of the FCRA and certainly includes the garden-variety credit report from a major credit bureau used by lenders and their MIs. A credit report contains information "bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" that the bureau "collected ... for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, employment, or other purposes for which the agency is permitted to provide reports under the FCRA, and is therefore undeniably included within the definition set forth in Section 603(d).(1) The report's status as a "consumer report" in this case is reinforced by the fact that the critical insurance factors relate to the consumer, not the lender with which the MI does business. First, the reason the MI is allowed to obtain a report on the loan applicant is because Section 604(a)(3)(C) provides a permissible purpose "in connection with the underwriting of insurance on the consumer" (emphasis added).(2) Second, the party evaluated by the MI is the consumer. Third, the premium when coverage is granted is paid by the consumer.

Finally, we are unpersuaded by your policy argument that consumers will be confused by receiving the notices required by

Section 615(a) from one or more MIs, even in the case where the loan application itself is ultimately approved when a second MI agrees to provide coverage. We believe that the benefit provided by the notice -- fulfilling Section 615's critical function of informing the consumer that something in a credit bureau file caused the MI's action -- outweighs any problems that might arise when consumers get the notice. If MIs, perhaps with the assistance of lenders with which they do business (as suggested in your January 22 letter, and discussed in the following paragraph), craft the text of their notices to explain to the applicant the circumstances under which the MI has taken its action and the process involved, potential confusion can be minimized. A notice that includes the specific items set forth in Section 615(a) will comply with that provision, even with such an explanation included in the text.

An MI may meet its responsibility under Section 615(a) by contracting with a lender (or other party) to deliver the notice to the consumer.(3) In that case, the lender may fulfill the MI's obligation by providing to the consumer either (1) a separate notice in the name of the MI, or (2) its own notice that communicates the refusal by one or more MIs to insure the loan (including, if applicable, information that the lender is required by Regulation B to disclose to the consumer if it has denied the loan application). In that way, MIs and their lender clients can arrange to comply with the FCRA without providing duplicative notices to the consumer.

The opinions set forth in this informal staff letter are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff

1. Your letter's lengthy argument that the lender and MI are engaged in a "commercial transaction" -- and that the insurance is issued for a "commercial purpose" as a technical matter -- is simply not germane to the status of a report from a credit bureau as a "consumer report." That might have relevance if the report concerned the applicant's business history and was provided by an agency that compiles and provides data for commercial purposes; in that case, personal references to a corporate director or officer would not change the commercial credit report into a consumer report. Comment 603(d)-4C, Federal Trade Commission Commentary on the FCRA, 55 Fed. Reg. 18804, 18810 (May 4, 1990).

2. A commercial purpose, standing alone, would be insufficient under Section 604 to provide the MI a permissible purpose to obtain a credit report on the consumer applicant.

3. Of course, the MI would have some exposure if the lender with which it contracted failed to deliver the required notice. However, Section 615(c) specifically would allow the MI to avoid liability if it "shows, by a preponderance of the evidence that at the time of the alleged violation [the MI] maintained reasonable procedures to assure compliance with the provisions of this section." We believe that this provision would protect an MI, if it contracted with one or more responsible lenders to deliver notices required by Section 615(a) and appropriately monitored such other parties' performance of that obligation.

Last Modified: Friday, June 24, 2011

Exhibit 3



**Federal Trade Commission**
**Protecting America's Consumers**

**Division of Credit Practices**
**Bureau of Consumer Protection**
**Ronald G. Isaac**
**Attorney**

**February 23, 1998**

Mr. Herman L. Allison
Contangy, Brooks & Smith, LLC
Suite 2400
230 Peachtree Street, N.W.
Atlanta, Georgia 30303-1557

Re: Section 603(h) of the Fair Credit Reporting Act

Dear Mr. Allison:

This will respond to your letter inquiring whether an employer that enters into a bona fide independent contractor relationship with an individual must comply with the applicable provisions of the Fair Credit Reporting Act ("FCRA") pertaining to consumer reports obtained for employment purposes.

You state that it is quite common for trucking operations to engage as drivers individuals who own and operate their own equipment and who themselves may hire drivers to operate their equipment. You read the FCRA to not apply to a trucking operation as it relates to such an independent contractor because you consider the independent contractor relationship to be a "business relationship" as opposed to an "employment relationship," and, you maintain, the independent contractor is not being hired "as an employee." You assert that a party who hires independent contractors should be treated like a homeowner who obtains a credit and criminal background check on an electrical contractor before hiring that individual to rewire the house, who you assert "is surely not required to comply with the provisions of the FCRA." For the reasons explained below, we view the trucking operation's hiring, or consideration for hiring, of independent drivers in the situation you describe to be for "employment purposes," as defined by Section 603(h) of the FCRA.

Section 603(h) provides, "[t]he term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." The Commission staff subscribes to the view, enunciated by the United States Court of Appeals for the Fourth Circuit in *Hoke v. Retail Credit Corporation*,(1) that the term "employment purposes," as used in the FCRA, should be interpreted liberally to effectuate the broad remedial purpose of the Act. The court therein ruled that information furnished by a consumer reporting agency to the Texas Board of Medical Examiners, which had requested the information to aid its assessment of a physician's application for a license to practice medicine, was furnished for "employment purposes" within the meaning of the FCRA, and thus was a "consumer report" subject to the provisions of the Act. The court reasoned:(2)

> If we were to apply the common-law concept of employee, we would undoubtedly conclude that a physician who practiced his profession as a sole practitioner or as a member of a medical partnership was an independent contractor, and not an employee, because of the absence of control over the manner in which he afforded expert medical services. But in construing FCRA, we are cognizant of its broad remedial purposes . . . and we are not constrained to limit its applicability by the common-law concept of master and servant.

The court opined further that the term "employment" is not limited, as you suggest, to situations in which the consumer is being evaluated "as an employee," because the ending phrase "as an employee" in the definition of "employment purposes" modifies only "retention," and not the words "employment, promotion, reassignment" preceding it.(3)

Therefore, we conclude that a trucking operation that uses consumer reports to evaluate whether to engage individuals as drivers must comply with the applicable provisions of the FCRA pertaining to consumer reports obtained for employment purposes, including the disclosure and authorization provisions of Section 604(b), Section 606, and Section 615. If the trucking

operation were not to obtain consumer reports on prospective drivers for "employment purposes," it would appear to have no permissible purpose under the FCRA for obtaining such reports, absent the drivers' written authorizations. Incidentally, a homeowner who is considering hiring an individual to perform services for the homeowner is indeed required to comply with the FCRA when obtaining a "consumer report" on that individual (which includes either the credit report or criminal background check you mentioned), and thus must abide by the applicable disclosure and authorization provisions of Section 604(b), Section 606, and Section 615 like any other employer.

This is an informal staff opinion and is not binding on the Commission.

Sincerely,

Ronald G. Isaac

1. 521 F.2d 1079, 1082 (4th Cir. 1975), *cert. denied*, 423 U.S. 1087 (1976).

2. *Id.* at 1082 n.7.

3. *Id.* at 1082.

---

Last Modified: Friday, June 24, 2011

Exhibit 4



**Federal Trade Commission**
Protecting America's Consumers

### UNITED STATES OF AMERICA
### FEDERAL TRADE COMMISSION
### WASHINGTON, D.C. 20580

Division of Credit Practices
Thomas E. Kane
Attorne

**October 27, 1998**

Harris K. Solomon, Esq.
Brinkley, McNerney, Morgan, Solomon & Tatum, LLP
New River Center, Suite 1800
200 East Las Olas Boulevard
Fort Lauderdale, Florida 33301-2209

   **Re:** Sections 603(h) and 604(b)(3) of the Fair Credit Reporting Act

Dear Mr. Solomon:

This responds to your request for a staff opinion regarding the Fair Credit Reporting Act ("FCRA"). You state that your client, a title insurance company, frequently enters into contracts with individuals to sell its insurance, examine title, and close real property transactions. According to your letter, the individuals work out of offices owned or leased by them or their employer. Your client does not consider the individuals to be its employees.

In an attempt to reduce embezzlement, your client plans to request that the individuals described above who handle funds from loan transactions involving your client agree in writing to permit your client to obtain investigative consumer reports or other types of consumer reports on them. You ask whether these individuals would be considered employees under the Fair Credit Reporting Act and note that, if your client does obtain these consumer reports for "employment purposes," it would have to comply with Section 604(b)(3) before taking any adverse actions against the individuals.(1) Section 603(h) states that "the term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."

As we stated in the enclosed letter (*Allison*, 2/23/98), Commission staff subscribes to the view that the term "employment purposes," as used in the FCRA, should be interpreted broadly. This view is consistent with the Federal Trade Commission's position in Comment 603(h)-2 of its Commentary on the Fair Credit Reporting Act,(2) which states that "[a] report in connection with security clearances of a government contractor's employees would be for 'employment purposes' under this section." That comment codified a 1986 Commission staff opinion letter, concerning consumer reports that the Defense Intelligence Agency ("DIA") was obtaining on employees of DIA's defense contractors to determine whether the employees were eligible for security clearances, which concluded that DIA was obtaining the consumer reports for "employment purposes."(3)

Staff believes that your client's relationship with the individuals who sell title insurance, examine titles, and close real property transactions would be similar to the relationship between DIA and the contractor's employees referred to in Comment 603(h)-2 and the underlying opinion letter. Like DIA, your client would be obtaining reports on individuals who are not its employees but will be performing work for your client. Also like DIA, your client would be obtaining the reports to determine whether the individual subjects of the reports are trustworthy. Thus, if your client obtained consumer reports on these persons, it would be obtaining them for "employment purposes" and would have to comply with Section 604(b)(3).(4)

The views set forth in this informal staff opinion are those of the staff and are not binding on the Commission.

Sincerely,

Thomas E. Kane

Enclosures

1. Section 604(b)(3) provides:

> In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates (A) a copy of the report; and (B) a description in writing of the rights of the consumer under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).

Section 615 imposes additional duties after a person has taken adverse action based on a consumer report for any reason.

2. 16 C.F.R. § 600 Appendix, 55 Fed. Reg. 18,804, 18,813 (May 4, 1990).

3. Ralph C. Clontz, Jr., Fair Credit Reporting Manual (rev. ed. & Supp. 1988), Letter No. 379 (copy enclosed).

4. Your client would also have to comply with Sections 604(b)(1)(A), 604(b)(2), and other sections that specifically refer to consumer reports obtained for "employment purposes."

Last Modified: Friday, June 24, 2011

Exhibit 5



# A Primer on the FCRA & Related State Law Compliance:  Can We Disqualify?

*Presented by:*

## Richard I. Greenberg
Jackson Lewis LLP
212-545-4000

## Joseph Rotondo
Sterling InfoSystems, Inc.
212-736-5100

STERLING

jackson|lewis
Preventive strategies.
Positive solutions.

## Overview of Seminar

⟁ When Are The FCRA and Related State Laws Applicable?

▲ Why Sterling Must Do Certain Things

- End User Agreement/Reporting Limitations

▲ What Employers Must Do

- Consent, Pre-Adverse and Adverse Action

- Practical Considerations

⟁ Disqualification of Applicants and Employees

▲ Federal and State Prohibitions/Best Practices

▲ Importance of Employment Application

jackson|lewis.

△ STERLING

2

# Overview of Seminar

- Recordkeeping And Retention
- Federal Trade Commission Activity (FTC)
  - ▲ New Data Furnisher Regulations
  - ▲ Proposed New Summary of Rights
- Resources
- Questions – use e-mail during presentation; use phone line during question and answer period

**jackson|lewis.**

△³ STERLING

## Vital Point to Recognize

▲ The FCRA and State Laws Provide Guidance Solely As To Process Issues

▲ Federal (To Some Extent) and State Laws Govern Disqualification Issues.

▲ Many Unsettled Issues

jackson lewis.

⁴ ▲ STERLING

# The Background Check Process and Governing Laws

- FCRA- Fair Credit Reporting Act

  ▲ CRA – Consumer Reporting Agency (Sterling)

  ▲ End User – Employer (Sterling Client)

- Applicable State Laws

  ▲ Less than Half the States have mini-FCRA Laws

jackson|lewis.

▲ STERLING

5

## The Background Check Process and Governing Laws

- FCRA Applies To All Information Provided By A CRA

  - ▲ Consistent with Legislative Purpose – Ensuring Entities That Compile Information From Various Sources Provide Only Fair And Accurate Information

- Two Types Of Checks - **consumer reports** and **investigative consumer reports.**

STERLING

6

jackson|lewis.

# The Background Check Process and Governing Laws

## Consumer Reports

- Reports Containing Information Solely Culled From Databases Or Public Records

## Investigative Consumer Reports

- Reports Which Also Include Information Based On Personal Interviews
- This Includes Reference Checking If Sterling Asks About Performance/Basis Of Separation, etc. – *Standard Practice*

7

△△ STERLING

jackson|lewis.