UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SCOTT ERNST, individually and as a            :
representative of a putative class,                  :
                               Plaintiff,    :
                                            :     12 Civ. 8794 (LGS)
               -against-                         :
                                            :     <u>ORDER & OPINION</u>
DISH NETWORK, LLC, et al.,                    :
                               Defendants. :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       Scott Ernst, the named Plaintiff in this putative class action, was a satellite dish installation technician employed by non-party Superior Satellite, Inc. ("Superior"). Defendants Dish Network L.L.C. and Dish Network Service L.L.C. (collectively "Dish") provide satellite television and installation services. Plaintiff alleges that Dish procured a credit report about him from Defendant Sterling Infosystems Inc. ("Sterling"), a consumer reporting agency, without his consent and without the proper disclosures. He further alleges that the report was used to terminate Plaintiff without Dish providing him with a copy of the report and a summary of his rights in violation of the Fair Credit Reporting Act (the "FCRA"), 15 U.S.C. § 1681. Plaintiff also asserts that Sterling violated the FCRA by providing outdated information and refusing to provide Plaintiff with its source of information upon request.

       Having completed the first phase of discovery, Dish and Plaintiff now cross-move for summary judgment on a single potentially dispositive issue -- whether the type of document obtained by Dish concerning Plaintiff (the "Summary Report") is a "consumer report" within the meaning of the FCRA and therefore subject to its strictures. For the reasons discussed below, Plaintiff's motion is granted because the Summary Report is a consumer report as defined by the FCRA.

**BACKGROUND**

The facts are taken from the parties' Rule 56.1 statements and the exhibits submitted in connection with the motions, and are undisputed except as otherwise noted.

When customers purchase Dish services, Dish installs a satellite dish at the customers' residences using its own employees or its network of third-party contractors. Installation and service call assignments are assigned through Dish's work order management system called "ETA Direct."

In the fall of 2010, Dish implemented a customer safety program that required third-party contractors to obtain a background report on any technician who entered the home of a Dish customer. Only third-party technicians who received a rating of "low risk" as a result of the background report were eligible to receive Dish work assignments or enter the homes of Dish customers. Dish worked with Defendant Sterling to develop a template for the information to be provided to third-party contractors in the reports about their technicians. Dish did not receive a copy of the full background reports. Instead, Dish received for each technician a Summary Report that contained only the following information: the company where the individual worked or was seeking employment; an order number based on the request for a background report; the date the background check request order was opened; the date the order was closed; the individual's first and last name; the last four digits of the individual's social security number; the individual's status in ETA Direct; the type of report that the third-party contractor ordered for the individual; and the individual's risk rating. The risk rating was one of three designations -- "high risk," "low risk," or "review."

Dish established the criteria that triggered these labels. The items in the background report that resulted in a "high risk" rating in the Summary Report included:

- Violent crimes -- "Assault, Terroristic Threats, Stalking, Harassment"

2

- Property crimes -- "Identity theft, Theft of property, Forgery"

- Sex crimes -- "Rape, Child pornography, Indecent liberties with a minor, Voyeurism" and "Sex offenders – registered or those who fail to register"

- Drug crimes -- "DUI – drug, Drug Trafficking/manufacture . . . Prescription fraud, Possession of controlled substance"

- Alcohol-related crimes -- "DUI – alcohol, Contribute to a minor, Drunk in public"

- "Miscellaneous -- Escape, Perjury, Conspiracy, Evading police officer, Espionage, Accessory . . . Disorderly Conduct, Breach of Peace"

- "Habitual Crim[inal] Offender"  -- Any three unrelated misdemeanor convictions

- Vehicular violations – "DUI Misdemeanor; Fail to Stop and Render Aid/Hit and Run; Fleeing Police Officer; Reckless Driving; Manslaughter/ Felony/Homicide Involving a Vehicle; Racing; Speed Contest; Theft of Vehicle," as well as having three or more "pre-hire" moving violations, including "Driver License Not in Possession; Failure to Use Signal " etc.

- "Ineligible" -- "*At Time of MVR [Motor Vehicle Record]*: License Not Valid; License *Currently* Suspended, Expired; Provisional or Restricted License; Learner's Permit (*NOTE:* These particular violations may not preclude the candidate permanently but he/she is *Ineligible at that time)*.  Risk [rating is] High until the issue is cleared and new MVR is rated Low Risk."  [emphasis in original]

Dish did not require its third-party contractors to terminate employees who were rated "high risk," but did not permit them to register in ETA Direct or act as Dish technicians.

Superior hired Plaintiff, Scott Ernst, as a technician in the fall of 2009.  During the relevant time, Superior was a third-party contractor for Dish, providing installation services to Dish customers in six states, and 99% of Superior's work was for Dish.  Dish had no ownership interest in Superior, and Plaintiff never received any income from Dish.

When Superior hired Plaintiff, Superior did not require employees to undergo background checks.  In April 2011, Dish informed Superior that it must obtain background reports on all third-party contractor technicians who provided services to Dish.  Dish did not request that Superior send it a background report directly.  On November 28, 2011, Superior sent a request to Sterling for a background report on Plaintiff.  The background report revealed that Plaintiff had

3

prior criminal convictions that resulted in his being rated "high risk" in the Summary Report sent to Dish.  Plaintiff's boss informed him that he would no longer be able to work on Dish assignments, but that he could remain with Superior and perform other work such as retail sales.  Plaintiff did not wish to perform retail sales and left Superior on December 9, 2011.

Dish never received the full background report concerning Plaintiff.  The full report that Superior received was seven pages long and contained detailed information about Plaintiff including his current and previous addresses, a detailed criminal records search, a detailed motor vehicle report, a sexual offender database search, a social security trace and a rating of "high risk."

## LEGAL STANDARD

The standard for summary judgment is well established.  Summary judgment is appropriate where the record before the Court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The Court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor.  *See id.* at 255.

## DISCUSSION

The issue on this motion -- whether the Summary Report Dish received is a "consumer report" under the FCRA -- is a question of statutory interpretation and therefore a question of law.  The material facts, recounted above, are not in dispute.  Applying the language of the statute, the Summary Report is a consumer report under the FCRA because it communicated information bearing on Plaintiff's character, general reputation, or mode of living, and the information was

collected and expected to be used for "employment purposes." Consequently, Plaintiff is entitled to summary judgment on this issue.

> I. **The Text of the Statute**

When interpreting a statute, a court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. DiCristina*, 726 F.3d 92, 96 (2d Cir. 2013) (quoting *United States v. Kozeny*, 543 F.3d 166, 171 (2d Cir. 2008)). "Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Id.* (internal quotation marks omitted). "Statutory enactments should, moreover, be read so as to give effect, if possible, to every clause and word of a statute." *Id.* (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). If the meaning of a statute is ambiguous, the court may resort to legislative history to determine the statute's meaning. *See Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007). But in so doing, a court must "construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results." *Id.* (quoting *Connecticut ex rel. Blumenthal v. United States Dep't of the Interior*, 228 F.3d 82, 89 (2d Cir. 2000)).

The FCRA protects consumers with regard to the collection and dissemination of personal information collected by consumer reporting agencies. *See generally* 15 U.S.C. § 1681. The statute permits a consumer reporting agency to furnish a consumer report under limited enumerated circumstances, including "to a person which it has reason to believe . . . intends to use the information for employment purposes." *Id.* at § 1681b(a)(3)(B). The statute prescribes conditions for furnishing and using a consumer report for employment purposes. *Id.* at § 1681b(b). Separate conditions apply to the consumer reporting agency that generates the report, a person who "procure[s]" or "cause[s] a consumer report to be procured," and a person who takes

adverse employment action based on the report. *Id*. The Complaint asserts three claims against Dish arising from its alleged failure to satisfy the conditions applicable to persons in the latter two categories.

Whether the Summary Report is a "consumer report" is critical because the answer determines whether Dish (or anyone) owed Plaintiff duties under the FCRA concerning the Summary Report. In the definition section, the FCRA defines "consumer report," in relevant part, as:

> [i] any written . . . communication of any information by a consumer reporting agency [ii] bearing on a consumer's credit worthiness, . . . character, general reputation, personal characteristics, or mode of living [iii] which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for -- (A) credit or insurance . . . [or] (B) employment purposes . . . .

*Id.* at § 1681a(d)(1). The definition can be divided into "three fundamental elements." *Yang v. Gov't Employees Ins. Co.*, 146 F. 3d 1320, 1323 (11th Cir. 1998). The first element is the "communication" element, which requires that a consumer reporting agency communicate information. *Id.* The second element is the "information" element, which requires that the information communicated bear on the consumer's "credit worthiness, character, general reputation, personal characteristics, or mode of living." *Id.* The third element is the "purpose clause." *Id.* The "purpose clause" requires that the information communicated must be "used or expected to be used or collected in whole or in part" for one of the enumerated purposes, which in this case is for "employment purposes." *See id.*

The parties do not dispute the communication element, or that Sterling is a "consumer reporting agency," *see* 15 U.S.C. § 1681a(f) (defining "consumer reporting agency"), or that Plaintiff is a "consumer," *see id.* at § 1681a(c) (defining "consumer"). In this case, only the last two elements -- the information and purpose elements of the consumer report definition -- are at issue.

## II. The Information Element

The Summary Report conveys information bearing on Plaintiff's character, general reputation, personal characteristics, or mode of living, and accordingly meets the information element of the FCRA.

The FCRA's information element requires that the information in the report bear "on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." *Id.* at § 1681a(d)(1). The information element "does not seem very demanding," as "almost any information about consumers arguably bears on their personal characteristics or mode of living." *Trans Union Corp. v. F.T.C.*, 245 F.3d 809, 813 (D.C. Cir. 2001) (internal quotation marks omitted); *see also Hoke v. Retail Credit Corp.*, 521 F.2d 1079, 1081 (4th Cir. 1975) (a consumer report "is virtually any information communicated by a consumer reporting agency" for any one of the purposes enumerated).

The Summary Report, based on the background report issued by Sterling to Superior, labeled Plaintiff as "high risk." The "high risk" label is facially disparaging and bears on Plaintiff's character and reputation. "High risk" is also a shorthand term, defined and understood by both Dish and Sterling, to convey information about prior criminal activity as well as driving information. Dish provided Sterling with criteria that triggered the "high risk" label, including assault, rape, theft, child pornography and drug trafficking. These and almost all of the other criteria that would result in a "high risk" rating bear on Plaintiff's "character, general reputation, [and] personal characteristics." 15 U.S.C. § 1681a(d)(1). The only exceptions relate to not having a fully valid driver's license, which bear on Plaintiff's "mode of living." *See, e.g.*, *Klonsky v. RLI Ins. Co.*, No. 11 Civ. 250, 2012 WL 1144031, at *3 (D. Vt. April 4, 2012) (information beyond basic identifying information conveys information about personal characteristics and mode of living); *see also Holmes v. Telecheck Int'l, Inc.*, 556 F. Supp. 2d 819,

7

832 (M.D. Tenn. 2008) (finding that code-based system of classifying check writers for merchants from "Code 0" to "Code 4" -- where each code indicates whether or not check should be accepted based on writer's risk factor-- conveys information under FCRA).  Consequently, the Summary Report conveys information bearing on Plaintiff's character, general reputation, personal characteristics, or mode of living.

Dish, citing *Manso v. Santamarina and Associates*, argues that the report cannot be said to bear on Plaintiff's character since the lack of a valid driver's license could have caused the "high risk" label.  No. 04 Civ. 10276, 2005 WL 975854, *7 (S.D.N.Y. Apr. 26, 2005) ("Neither speeding nor driving without a seatbelt is an offense that would commonly be described as reflecting upon one's moral character or reputation.").  This argument fails.  First, as noted in *Klonsky*, whether or not an individual has a valid driver's license might not bear on his character, but it might describe his "mode of living," which is broad and undefined.  2012 WL 1144031 at *3 (disagreeing with holding in *Manso*); *see also Hoke*, 521 F.2d at 1081 (finding character and mode of living clause "virtually limitless").

Second, all or virtually all of the remaining information that would trigger a "high risk" rating undoubtedly bears on Plaintiff's character, such as a drug trafficking or a drunk driving arrest.  The report in this case, unlike the one in *Manso*, was not limited to identifying information and driving information.  A "high risk" rating on the Summary Report in effect says that, except in the narrow circumstance that Plaintiff does not have a fully valid driver's license, he has done something highly improper that impugns his moral character.

The "high risk" label in this case bears on Plaintiff's character and reputation, as well as his mode of living.  The report therefore satisfies the "information element" of a consumer report under the FCRA.

### III.     The "Purpose Clause"

The third element of the definition of consumer report requires that the report was used, expected to be used, or collected for, among other things, employment purposes. It was.

As an initial matter, the text of the "purpose clause" in § 1681a(d)(1) is in the passive voice. It requires information "which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for-- (A) credit or insurance . . . [or] (B) employment purposes . . . ." The actor who is using, expecting to use or collecting the report is neither limited nor specified. This means that if anyone uses, expects to use or collects the information for employment purposes, the statutory definition of "consumer report" is satisfied. "Under the plain language of the FCRA, a 'communication of information' is a 'consumer report' if *any one of the three components* [collection, expectation of use, or actual use for employment purposes] in the Purpose clause is met." *Yang*, 146 F.3d at 1325 (emphasis in original). Here the information was collected by Sterling, was expected to be used and actually was used, by both Dish and Superior. The only remaining question is whether Plaintiff's information was collected and used for "employment purposes."

The FCRA defines "employment purposes" in the context of a consumer report as "a report used for the purposes of evaluating a consumer for employment, promotion, reassignment, or retention as an employee." 15 U.S.C. § 1681a(h). Here, the information in the Summary Report was collected, expected to be used and actually used to evaluate Plaintiff for reassignment or retention as an employee. Sterling, the consumer reporting agency, collected the information in the Summary Report at Superior's request. Superior was required to obtain the information as part of Dish's consumer program, and Dish required a Summary Report to verify compliance with the program. Superior and Dish would have allowed Plaintiff to work in Dish customer

9

homes if Sterling's report on Plaintiff had labeled him "low risk." The report labeled him "high risk," so Plaintiff was prevented from working in Dish homes. Because Plaintiff was not allowed to work in Dish homes, he ultimately was offered the option of being reassigned to sales or leaving his job. Thus, both Superior and Dish expected the Summary Report to be used for employment purposes, and it actually was used for employment purposes, ultimately leading to Plaintiff's resignation.

Dish argues that the report must be related to a consumer transaction and must be obtained for a consumer purpose. The statutory definition of "consumer report" contains no such requirement. Although a "consumer report" must contain certain information about a "consumer" and be collected or used for specified purposes relating to a "consumer," the term is defined broadly as "an individual" and thus, on its face, encompasses any natural person. *See* 15 U.S.C. § 1681a(c).

Dish makes a series of arguments that essentially reduce to one -- that the Summary Report is not a consumer report under the FCRA because Dish itself did not use the Summary Report for its employment purposes, but rather used the report for its customers' safety in dealing with its sub-contractor's employee. Accordingly, Dish denies that it had an employment purpose in obtaining the Summary Report and denies that it had an employment relationship with Plaintiff. These arguments are unavailing. Contrary to Dish's arguments, the statutory definition of "consumer report" does not require use for an "employment purpose" by Dish. As discussed above, the statute requires that the information be collected or used for "employment purposes" without specifying who is using or collecting the information. Superior used the information in the Summary Report for an "employment purpose," namely for "reassignment or retention as an employee." 15 U.S.C. § 1681a(h). Consequently, the Summary Report meets the definition of a "consumer report."

Dish reads the definition of "consumer report" to mean that information is subject to FCRA protections *only* when the information is being used for employment purposes, and not *after* it has been collected or used for employment purposes. In other words, Dish argues that a document's status as a "consumer report" is fluid depending on its use, who is using it and for what purpose. The better interpretation is that the status of a consumer report is static: if a writing acquires the status of a "consumer report," based on its content and intended use, it is thereafter subject to the FCRA. While the literal words of the statute may be susceptible to both interpretations (a writing "which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes"), Dish's reading must be rejected because it would lead to an absurd result that is inconsistent with the primary goal of the statute. *See United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results.").

The Fifth Circuit rejected the interpretation Dish puts forward because the court "simply c[ould ]not conclude that Congress intended such an illogical result." *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 885 (1989). In *St. Paul Guardian Insurance Co. v. Johnson*, the court held that an insurance company that obtained a credit report for a non-FCRA purpose (to investigate an insurance claim) was still required to comply with the FCRA in handling the report. *Id.* The court reasoned that because the report's information originally had been collected for a "purpose" under the FCRA, the report remained a "consumer report" as defined by the FCRA, regardless of how the insurance company ultimately used the report. *Id.* The court observed that an interpretation of "consumer reports" that turned on actual use would lead to an "illogical result" and defeat the purpose of the statute: "If used for non-FCRA purposes a credit report would be releasable [to a user] because it would not fall with[in] the FCRA definition of a consumer report. If used for FCRA purposes, a credit report would likewise be releasable

11

because it would meet the definition of consumer report." *Id.* This interpretation was contrary to the statute's primary goal of "protect[ing] an individual from inaccurate or arbitrary information . . . in a consumer report." *Id.* at 883 (internal quotation marks omitted).

Even if Dish "did not ultimately use [Plaintiff's] . . . report for one of the FCRA's enumerated purposes, the information in the report nevertheless was 'collected in whole or in part' by a credit reporting agency for FCRA enumerated purposes. Thus, under a plain reading § 1681a(d), the report obtained by [Dish] is a 'consumer report' to which the provisions of the FCRA apply." *Id.* at 884; *accord Bakker v. McKinnon*, 152 F.3d 1007, 1012 (8th Cir. 1998) ("Under the FCRA whether a credit report is a consumer report does not depend solely upon the ultimate use to which the information contained therein is put, but instead, it is governed by the purpose for which the information was originally collected in whole or in part by the consumer reporting agency."); *Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1274 (9th Cir. 1990) ("If a consumer reporting agency provides a report based on a reasonable expectation that the report will be put to a use permissible under the FCRA, then that report is a 'consumer report' under the FCRA and the ultimate use to which the report is actually put is irrelevant to the question of whether the FCRA governs the report's use and the user's conduct.").

Dish cites one district court case holding that the FCRA applies only to an employee of the employer that received the report. *See Lamson v. EMS Energy Mktg. Serv., Inc.*, 868 F. Supp. 2d 804, 816 (E.D. Wis. 2012) (holding that an independent contractor could not sue under the FCRA). The underlying logic of *Lamson*, however, is at odds with the disjunctive nature of the statute and would lead to the same illogical results that the Fifth Circuit noted in *St. Paul Guardian Insurance Co.* 884 F.2d at 885. As the Fourth Circuit has held, the definition of "employment purpose" does not restrict the FCRA to an employee of the employer that received the report. *See Hoke*, 521 F.2d at 1081-82 (finding employment purpose where credit report was

obtained as part of doctor's licensing procedure) (cited by *Advanced Conservation Sys., Inc. v. Long Island Lighting Co.*, 113 F.3d 1229, at *2 (2d Cir. 1997) (unpublished table opinion) (finding employment purpose where public utility obtained and relied on credit report of plaintiff to determine that his company should not be included in a directory of reliable service providers whom utility customers might hire)).

For these reasons, the Summary Report satisfies the purpose element of the definition of "consumer report."

**CONCLUSION**

For the reasons discussed above, the Summary Report is a "consumer report" for purposes of the FCRA.  Accordingly, Plaintiff's motion for summary judgment is GRANTED, and Dish's motion for summary judgment is DENIED.  The Clerk is directed to close the motions at docket numbers 72 and 76.

The parties shall appear for a status conference on October 3, 2014, at 11:10 a.m., when they shall inform the Court how they intend to proceed.

SO ORDERED.

Dated: September 22, 2014
      New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**
